

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 10, 2023**

_____

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 19-44296-ELM |
| RANDALL VERNON KEYLOR, | § | |
| | § | Chapter 7 |
| Debtor. | § | |
| | § | |
| WILLIAM T. NEARY, | § | |
| United States Trustee, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Adversary No. 20-04050 |
| | § | |
| RANDALL KEYLOR, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

In this adversary proceeding, Plaintiff William T. Neary (the "**U.S. Trustee**"), the United States Trustee for the region covering this district, has filed the _United States Trustee's Complaint Objecting to Debtor's Discharge_ (the "**Complaint**")[1] to seek the denial of a chapter 7 discharge

_____

[1] Docket No. 1.

to Defendant Randall Keylor (the "**Keylor**"), the chapter 7 debtor in Case No. 19-44296 (the "**Bankruptcy Case**").  Specifically, alleging that Keylor knowingly and fraudulently made false statements under oath in his bankruptcy schedules and statement of financial affairs and at the section 341 meeting of creditors conducted in the case, the U.S. Trustee objects to Keylor's discharge pursuant to section 727(a)(4)(A) of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.* (the "**Bankruptcy Code**").[2]

While Keylor admits in his *Response to Trustee's Complaint Objecting to Debtor's Discharge* (the "**Answer**") to having provided certain inaccurate initial disclosures,[3] he takes issue with allegations of other false statements and, in any event, denies having knowingly and fraudulently made any misstatements.  Therefore, Keylor requests that the U.S. Trustee's discharge objections be overruled and that he be granted a discharge without exception.

On May 27, 2021, the adversary proceeding came on for trial before the Court, at the conclusion of which the Court took the matter under advisement.  Having now considered the Complaint, the Answer, the parties' Joint Stipulations,[4] the parties' respective other pretrial filings,[5] the evidence admitted, and arguments of counsel, the Court now issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052.[6]

---

[2] The U.S. Trustee also objected to Keylor's discharge pursuant to section 727(a)(5) of the Bankruptcy Code, but at the trial docket call held on May 3, 2021, counsel for the U.S. Trustee announced that the U.S. Trustee was no longer pursuing the section 727(a)(5) claim.  Therefore, the Court deems such objection to have been waived.

[3] *See* Docket No. 5.

[4] *See* Docket No. 26 (*First Amended Joint Pretrial Order*, § F ("**Joint Stipulations**")).

[5] *See* Docket Nos. 16, 18 and 19.

[6] To the extent any of the following findings of fact are more appropriately categorized as conclusions of law or include any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law are more appropriately categorized as findings of fact or include any findings of fact, they should be deemed as such.

## *JURISDICTION*

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and

157 and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings*

*Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984).  Venue of the proceeding in the Northern District of

Texas is proper under 28 U.S.C. § 1409.  The proceeding is a core proceeding within the meaning

of 28 U.S.C. § 157(b)(2)(J).

## *FACTUAL BACKGROUND*

On October 20, 2019 (the "**Petition Date**"), Keylor commenced the Bankruptcy Case with

the filing of his voluntary petition for relief under chapter 7 of the Bankruptcy Code.  Keylor is in

his sixties and married to Paula Keylor ("**Mrs. Keylor**"), who did not file for bankruptcy with him.

The Keylors have two sons, who were ages 17 and 20 as of the Petition Date.

**A.**    ***Keylor's Prepetition Call Center Business***

While Keylor only attained a high school education, he became very successful in business,

having managed to break into the call center industry and own and manage several businesses prior

to the Petition Date.  Keylor was initially self-employed, beginning in 1984.[7]  Eventually, after

gaining many years of experience in the call center business field and developing valuable business

contacts, he operated a call center business for cable companies through Integrated Alliance, LP

("**Integrated Alliance**"), a limited partnership in which Keylor owned a 99% partnership interest

and Blue Sky Communication Services, Inc. ("**Blue Sky**") owned a 1% partnership interest.  Blue

Sky, an entity wholly owned by Keylor, served as Integrated Alliance's general partner.[8]

---

[7] Joint Stipulations, ¶ 5.

[8] *See* Joint Stipulations, ¶¶ 37, 39-40.

Keylor formed GPK Capital Management, LLC ("**GPK Capital**"), another entity wholly owned by Keylor,[9] to manage Integrated Alliance's accounts receivable and employee payroll. Keylor used another of his wholly owned companies, Source One Capitalization Group, Inc. ("**Source One**"), to serve as Integrated Alliance's "partnership representative" for federal income tax purposes with Keylor identified as the "designated individual" of Source One for such purposes.[10]

Integrated Alliance primarily serviced a single customer – Comcast Corporation ("**Comcast**"). For many years, Integrated Alliance was successful. Between 2010 and 2015, for example, it maintained 120 to 200 employees at a time. And during the period of Keylor's ownership of Integrated Alliance, the company employed a total of approximately 16,000 people.

Anticipating the development of greater business with Comcast, Keylor caused Integrated Alliance to begin constructing a second call center. To finance the construction, Keylor used some of his own personal savings and funds from his individual retirement account and also took out loans in his own name. Integrated Alliance scheduled the launch of its second call center for the first quarter of 2017. At this same time, Keylor formed a new entity named the IA Center of Excellence (the "**IA Center**") which Keylor intended to use to rebrand the call center business once the second call center was opened.

**B.**    *Keylor's Prepetition Real Estate Business and Joint Automobile Purchases*

In addition to operating a call center business, Keylor separately invested in real estate. Keylor formed two limited liability companies – Buckeye Capital Management, LLC ("**Buckeye Management**") and Buckeye Capital Investments, LLC ("**Buckeye Investments**") – to own and

---

[9] *See* Joint Stipulations, ¶ 37.

[10] *See* Joint Stipulations, ¶¶ 36, 38.

Case 20-04050-elm   Doc 36   Filed 07/10/23   Entered 07/10/23 09:07:08   Desc Main
Document       Page 5 of 29

manage the real estate investments.  At all relevant times, Keylor held a 20% ownership interest in the entities and served as their manager.  The Keylor Family Trust (the "**Family Trust**") owned the remaining 80% interest in the entities.

### 1.    *Buckeye Management*

Among the real estate projects that Buckeye Management invested in was a property located in Corpus Christi, Texas.  Specifically, on or about April 18, 2016, Buckeye Management acquired certain real property located at 6314 Yorktown Blvd., Corpus Christi, Texas 78414 (the "**Corpus Property**").[11]  The Corpus Property was leased to third parties, and portions of the rental income were distributed to Keylor, as a part owner of Buckeye Management.[12]

On May 31, 2019, Buckeye Management sold the Corpus Property for $2.9 million.[13] According to the settlement statement signed by Keylor on behalf of Buckeye Management, Buckeye Management received $653,156.05 in net sales proceeds after the payment of sales commissions and all debts secured by the Corpus Property.[14]  Buckeye Management had no remaining liabilities after the sale.[15]  In early July 2019, $560,000 of the net sales proceeds were wired into a Buckeye Management Fidelity account ending in 9495 (the "**Buckeye Fidelity Account**").[16]  Following the deposit, Keylor caused $80,000 of the funds on deposit in the Buckeye Fidelity Account to be transferred to Keylor's individually-owned Fidelity account ending in 6262

---

[11] *See* Joint Stipulations, ¶¶ 73-74.

[12] *See* Joint Stipulations, ¶ 72.

[13] Joint Stipulations, ¶ 74.

[14] Joint Stipulations, ¶¶ 75-77.

[15] Joint Stipulations, ¶ 78.

[16] *See* Joint Stipulations, ¶¶ 79-81.

(the "**Keylor Fidelity Account**").[17]  Thereafter, Keylor caused an additional $59,700 in funds to be periodically transferred from the Buckeye Fidelity Account to the Keylor Fidelity Account.[18]

Separately, in 2016, Buckeye Management and Keylor, as co-buyers, purchased a new 2016 Porsche Cayman from Park Place Porsche in Dallas, Texas (the "**Porsche**").[19]  A portion of the purchase price was financed.[20]  Prior to the Petition Date, the Keylors insured the Porsche under an individual insurance policy they maintained with Allstate Insurance Company.[21]

As of October 31, 2019, less than two weeks after the Petition Date, the Buckeye Fidelity Account had a balance of $414,527.41.[22]  As of the Petition Date, Buckeye Management continued to hold a joint ownership interest in the Porsche.  In 2020, after the Petition Date, Keylor either sold or surrendered the Porsche.[23]

### 2.    *Buckeye Investments*

Among the real estate projects that Buckeye Investments invested in was a property located in Carrollton, Texas.  Specifically, in 2016 Buckeye Investments acquired a 17,000 square foot medical plaza located at 1735 Keller Springs, Carrollton, Texas 75007 (the "**Carrollton Property**").  The Carrollton Property was leased to third parties, and portions of the rental income were distributed to Keylor.[24]  As of the Petition Date, Buckeye Investments still owned the

---

[17] *See* Joint Stipulations, ¶¶ 82-83.

[18] *See* Joint Stipulations, ¶ 84; Exh. UST-25, pp.13, 37 and 49.

[19] *See* Exh. UST-19.; Joint Stipulations, ¶ 60.

[20] *See* Exh. UST-19; Joint Stipulations, ¶ 61.

[21] *See* Joint Stipulations, ¶ 56.

[22] Joint Stipulations, ¶ 87.

[23] Joint Stipulations, ¶ 62.

[24] *See* Exh. UST-22, at p.10 (Schedule E of 2019 tax return).

Carrollton Property, and as of December 2019, not long after the filing, it still had eight tenants at the Carrollton Property.

In 2016, Buckeye Investments and Keylor, as co-buyers, purchased a new 2017 Audi Q7 from Audi Plano in Plano, Texas (the "**Audi**").[25]  Keylor was the primary user of the Audi.[26]  In 2017, Buckeye Investments and Keylor, as co-buyers, purchased a 2016 BMW 528 from BMW of Dallas in Dallas, Texas (the "**BMW**").[27]  Mrs. Keylor was the primary user of the BMW.[28]  In the case of both purchases, a portion of the purchase price was financed.[29]

Prior to the Petition Date, the Keylors insured the Audi and BMW under an individual insurance policy they maintained with Allstate Insurance Company.[30]  In 2020, after the Petition Date, the BMW was repossessed.[31]  The Audi, on the other hand, was used by Keylor until at least May 2021.[32]

## C.    *The Call Center Business Failure and the Resulting Bankruptcy Filing*

Eventually, Keylor's call center business began to crumble after the loss of key relationships with personnel at Comcast and Keylor's unsuccessful effort to open the second call center.[33]  After dropping from gross income of $1,682,625 in 2018[34] to gross income of $931,981

---

[25] *See* Exh. UST-20; Joint Stipulations, ¶ 63.

[26] *See* Joint Stipulations, ¶ 65.

[27] *See* Exh. UST-21; Joint Stipulations, ¶ 66.

[28] Joint Stipulations, ¶ 69.

[29] *See* Exh. UST-21; Joint Stipulations, ¶¶ 64 and 67.

[30] *See* Joint Stipulations, ¶ 56.

[31] Joint Stipulations, ¶ 70.

[32] *See* Joint Stipulations, ¶ 65.

[33] Joint Stipulations, ¶ 46.

[34] Joint Stipulations, ¶ 41.

in 2019,[35] Keylor decided to wind down the Integrated Alliance business.[36]  While Integrated Alliance remained active as of the Petition Date, by the first quarter of 2020, within six months of the bankruptcy filing, Integrated Alliance was completely shut down.[37]

Integrated Alliance's troubles also had an effect on GPK Capital, which has been organized to manage Integrated Alliance's accounts receivable and employee payroll.  While GPK Capital's investment account at Fidelity ending in 1395 (the "**GPK Fidelity Account**") had a value of over $15,000 as of the end of November 2018, by the end of October 2019, roughly a week after the bankruptcy filing, the value had dipped to $2,177.30.[38]

The failure of the call center business also presented tax liability risk to Keylor.  During Keylor's watch, Integrated Alliance had managed to rack up substantial unpaid Form 941 federal tax obligations.[39]  Seeing no way to resolve the financial blowback that the business faced, in the Fall of 2019 Keylor sought out legal advice from his long-time lawyer, Randy Taub ("**Taub**").[40]

Taub had provided legal advice and services to Keylor going back to 2008.[41]  Among other things, Taub had handled the organization of Integrated Alliance, Blue Sky, Source One, GPK Capital, the Family Trust, Buckeye Management, and Buckeye Investments.[42]  Taub had also represented Keylor in prepetition litigation.[43]  While Taub had minimal bankruptcy experience,[44]

---

[35] Joint Stipulations, ¶ 42.

[36] *See* Joint Stipulations, ¶ 50.

[37] Joint Stipulations, ¶ 51.

[38] *See* Exh. UST-27 (GPK Fidelity Account statements).

[39] *See* Joint Stipulations, ¶ 48.

[40] *See* Joint Stipulations, ¶ 94.

[41] Joint Stipulations, ¶ 95.

[42] *See* Joint Stipulations, ¶¶ 97-103.

[43] *See* Joint Stipulations, ¶ 104.

[44] *See* Joint Stipulations, ¶ 6.

he advised Keylor to pursue chapter 7 bankruptcy relief, proposing to serve as his counsel in connection with the filing.[45]   Keylor agreed and retained Taub for such purpose.[46]

**D.**      ***The Bankruptcy Filing and Initial Disclosures Made***

As previously indicated, Keylor filed for bankruptcy protection on October 20, 2019. Marilyn Garner (the "**Chapter 7 Trustee**") was appointed to serve as trustee of Keylor's bankruptcy estate.   On the same date as the bankruptcy filing, the Court issued a notice of the filing in which, among other things, the Court provided notice of the February 18, 2020, deadline for the filing of objections to discharge and to the dischargeability of debt (the "**Discharge Objection Deadline**").[47]

In advance of the bankruptcy filing, Taub instructed Keylor to assemble information concerning his assets and debts and to complete a questionnaire for purposes of completing his schedules of assets and liabilities (the "**Schedules**") and a statement of financial affairs (the "**SOFA**").   Keylor and Taub thereafter had numerous phone conversations and text communications in preparation for the bankruptcy filing and met in person a few times at Taub's office.[48]

**1.**      ***The Original SOFA***

The SOFA is designed to, among other things, obtain a debtor's disclosure of prepetition income and the debtor's ownership and/or control of any businesses.   On November 4, 2019, Keylor filed his original SOFA in the Bankruptcy Case (the "**Original SOFA**").[49]   In signing the

---

[45] *See* Joint Stipulations, ¶ 94.

[46] *See* Joint Stipulations, ¶¶ 92-93.

[47] *See* Bankruptcy Case Docket No. 5.

[48] *See* Keylor Deposition, at p.28, line 8 – p.29, line 1.

[49] *See* Exh. UST-2 (Original SOFA).

Original SOFA, Keylor verified that "I have read the answers on this Statement of Financial Affairs and any attachments, and I declare under penalty of perjury that the answers are true and correct."[50]

### (a) Prepetition Income (SOFA Questions 4 and 5)

Question 4 of the SOFA requires a debtor's disclosure of the debtor's income from employment and from operating a business during the year of the bankruptcy filing and during the two previous calendar years. It instructs a debtor to fill in the total amount of income received from all jobs and all businesses, including part-time activities.[51] Question 5 of the SOFA requires a debtor's disclosure of all other forms of income during the same time frame, and instructs a debtor to include the income regardless of whether it is taxable.[52]

In response to Questions 4 and 5, Keylor disclosed that all of his income in 2017, 2018, and the prepetition period of 2019 came from operating a business, as summarized below:[53]

| Period | Gross Income from Wages, Commissions, Bonuses, Tips | Gross Income from Operating a Business | Gross Income from All Other Sources (including dividends) |
|---|---|---|---|
| 1/1/2019 – 10/20/2019 | $0 | $61,626 | $0 |
| 1/1/2018 – 12/31/2018 | $0 | $82,168 | $0 |
| 1/1/2017 – 12/31/2017 | $0 | $(25,000) | $0 |

Keylor did not disclose any income from employment and did not disclose any income in the form of dividends or distributions from the businesses in which he held an ownership interest.

### (b) Business Ownership and Connections (SOFA Question 27)

Question 27 of the SOFA requires a debtor's disclosure of any businesses owned by the debtor within 4 years of the bankruptcy filing, and any businesses as to which the debtor had one

---

[50] *See* Original SOFA, at p12.

[51] *See* Original SOFA, at p.2 (Question 4).

[52] *See* Original SOFA, at p.2 (Question 5).

[53] *See* Original SOFA, at p.2 (responses to Questions 4 and 5).

or more of the following (among other) connections within the same time frame: member of a limited liability company or limited liability partnership; partner in a partnership; officer, director, or managing executive of a corporation; or owner of at least 5% of the voting or equity securities of a corporation.[54]

In response to Question 27, Keylor disclosed only his status as an officer, director, or managing executive of Blue Sky and his indirect control of Integrated Alliance through Blue Sky, Integrated Alliance's general partner.[55]  Keylor did not disclose any ownership interest in or position of control of GPK Capital, Source One, Buckeye Management, Buckeye Investments, or IA Center.

### (c) Held or Controlled Property of Someone Else (SOFA Question 23)

Question 23 of the SOFA requires a debtor's disclosure of any property that the debtor is holding or controlling for someone else.[56]  In response to Question 23, Keylor verified that he was not holding or controlling any such property.[57]

### 2.    The Original Schedules

The Schedules are designed to, among other things, obtain a debtor's disclosure of all owned assets, both tangible and intangible.  On November 18, 2019, Keylor filed his original Schedules in the Bankruptcy Case (the "**Original Schedules**").[58]  In signing the Original Schedules, Keylor verified that "[u]nder penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct."[59]

---

[54] *See* Original SOFA, at p.11 (Question 27).

[55] *See* Original SOFA, at p.11 (response to Question 27).

[56] *See* Original SOFA, at p.10 (Question 23).

[57] *See* Original SOFA, at p.10 (response to SOFA Question 23).

[58] *See* Exh. UST-3 (Original Schedules).

[59] *See* Original Schedules, at p1.

### *(a) Vehicle Ownership (Schedule A/B Question 3)*

Question 3 of Schedule A/B requires a debtor to disclose all vehicles that the debtor owns or leases, or in which the debtor has a legal or equitable interest, whether driven by the debtor or by someone else.[60]  In response to Question 3, Keylor disclosed that he owned no such interest in any vehicles.[61]  Keylor did not schedule any ownership interest in the Porsche, Audi, or BMW.

### *(b) Business Ownership (Schedule A/B Questions 19, 37 and 42)*

Question 19 of Schedule A/B requires a debtor to disclose the debtor's ownership of all non-publicly traded stock and interests in incorporated and unincorporated businesses, including interests in LLCs, partnerships, and joint ventures.[62]  Question 37 of Schedule A/B requires a debtor to disclose if the debtor owns any legal or equitable interest in any business-related property.[63]  Somewhat duplicative of Question 19, Question 42 of Schedule A/B requires a debtor to disclose all of the debtor's interests in partnerships and joint ventures.[64]  In response to all of these questions, Keylor disclosed that he owned no such stock, partnership, joint venture, or other equity interests, and owned no business-related property.[65]  In other words, Keylor did not disclose any ownership interest in Integrated Alliance, Blue Sky, GPK Capital, Source One, Buckeye Management, or Buckeye Investments.

---

[60] *See* Original Schedules, at p.5 (Schedule A/B Question 3).

[61] *See* Original Schedules, at p.5 (response to Schedule A/B Question 3).

[62] *See* Original Schedules, at p.8 (Schedule A/B Question 19).

[63] *See* Original Schedules, at p.11 (Schedule A/B Question 37).

[64] *See* Original Schedules, at p.12 (Schedule A/B Question 42).

[65] *See* Original Schedules, at pp.8, 11 and 12 (responses to Schedule A/B Questions 19, 37 and 42).

E.      *Keylor's Initial Supplemental Disclosures*

    1.      *The First and Second Supplemental Disclosure Declarations
       and First Amended Schedules*

On November 20, 2019, two days after the filing of Keylor's Original Schedules, Keylor

filed a *Declaration Regarding Income* in the Bankruptcy Case (the "**First Supplemental**

**Disclosure Declaration**")[66] for the apparent purpose of bolstering his verified disclosure of having

received no income from employment.[67]  Indirectly, the filing had the effect of disclosing Keylor's

sole ownership of, and position of managerial control (President) over, GPK Capital,[68] thus calling

into question prior disclosures made in both the Original Schedules and the Original SOFA with

respect to business ownership and control.  Approximately three weeks later, on December 10,

2019, Keylor filed a *Declaration of Amendment to Debtor's Financial Statement* in the Bankruptcy

Case (the "**Second Supplemental Disclosure Declaration**") for the apparent purpose to formally

amend his response to Question 27 of the Original SOFA to disclose his sole ownership of GPK

Capital.[69]  Correspondingly, on December 13, 2019, Keylor filed an amended Schedule A/B (the

"**First Amended Schedules**") to formally amend his response to Question 19 of Schedule A/B of

the Original Schedules to disclose his sole ownership of GPK Capital.[70]

No other changes were made to the Original Schedules and Original SOFA and each of the

Supplemental Disclosure Declarations and the First Amended Schedules was signed by Keylor as

true and correct under penalty of perjury.

---

[66] *See* Exh. UST-4 (First Supplemental Disclosure Declaration).

[67] In particular, Keylor declared that he was not receiving a fixed salary from GPK Capital and that he had not received any income draws from GPK Capital within 60 days of the bankruptcy filing.  *See* First Supplemental Disclosure Declaration, ¶¶ 3-4.

[68] *See* First Supplemental Disclosure Declaration, ¶ 2.

[69] *See* Exh. UST-5 (Second Supplemental Disclosure Declaration).

[70] *See* Exh. UST-6 (First Amended Schedules), at pp.2 and 7 (declaration and response to Question 19).

Case 20-04050-elm   Doc 36   Filed 07/10/23   Entered 07/10/23 09:07:08   Desc Main
Document    Page 14 of 29

## 2.    The Second Amended Schedules

Notwithstanding the verifications of accuracy contained within the Supplemental Disclosure Declarations and First Amended Schedules, on December 17, 2019, a mere four days later, Keylor filed a further amended Schedule A/B (the "**Second Amended Schedules**") to amend Question 19 of Schedule A/B to add his sole ownership of Blue Sky.[71]  No other modifications were made to the Schedules to reflect any other business interests owned by Keylor and Keylor verified the accuracy of Schedule A/B, as amended, under penalty of perjury.

## F.    Sworn Testimony at the 341 Meeting

On December 18, 2019, the Chapter 7 Trustee conducted the meeting of creditors statutorily mandated by section 341 of the Bankruptcy Code (the "**341 Meeting**").  Keylor and his attorney, Taub, appeared at the 341 Meeting.[72]

After taking an oath to testify truthfully, Keylor confirmed that he and Taub had met in advance of the Petition Date to discuss Keylor's financial situation, that Keylor had had an opportunity to read and review the Original Schedules and Original SOFA before they were signed and filed with the Court, that certain errors and omissions were thereafter discovered that were corrected in advance of the 341 Meeting, and that the Original Schedules and Original SOFA, as supplemented/amended by the First and Second Supplemental Disclosure Declarations and the First and Second Amended Schedules, accurately reflected all of Keylor's assets and liabilities and accurately described his financial situation as of the Petition Date.[73]  Keylor specifically affirmed that, after taking into account the corrections he had made to disclose his ownership in GPK Capital

---

[71] *See* Exh. UST-7 (Second Amended Schedules), at p.6 (response to Question 19).

[72] *See* Exh. UST-15 (the "**341 Meeting Transcript**").

[73] *See* 341 Meeting Transcript, at pp.2-6.

and Blue Sky, he had fully disclosed his ownership in business entities[74] and that, putting aside Mrs. Keylor's separate property interest in clothes, he had disclosed "everything that [he] and [his] wife own on the face of the earth."[75]

### G.    The Post-341 Meeting Supplemental Disclosures

#### 1.    The Third Amended Schedules

Nearly a month and a half after conclusion of the 341 Meeting, and despite Keylor's sworn testimony with respect to the accuracy of his Schedules and SOFA, as amended up to the time of the 341 Meeting, on January 31, 2020, Keylor filed yet another amended Schedule A/B (with a copy thereof with the required, signed declaration under penalty of perjury filed on February 3, 2020) (together, the "**Third Amended Schedules**").[76]  Pursuant to the Third Amended Schedules, Keylor amended his response to Question 19 of Schedule A/B to add his sole ownership of Source One.[77]   Keylor did not disclose any ownership interest in Integrated Alliance, Buckeye Investments, or Buckeye Management.

#### 2.    The Third Supplemental Disclosure Declaration

On January 31, 2020, Keylor also filed a *Second Declaration of Amendment to Debtor's Statement of Financial Affairs* (the "**Third Supplemental Disclosure Declaration**") with the intent to further amend his response to Question 27 of the SOFA to disclose his sole ownership of Blue Sky and to disclose Blue Sky's control of Integrated Alliance, as its general partner.[78]  No other changes were made to the SOFA and Keylor reaffirmed the accuracy of the disclosures

---

[74] *See* 341 Meeting Transcript, at pp.9-10.

[75] *See* 341 Meeting Transcript, at p.10.

[76] *See* Exhs. UST-9 and UST-11 (together, the Third Amended Schedules).

[77] *See* Third Amended Schedules, at p.5 (response to Question 19).

[78] *See* Exh. UST-10 (Third Supplemental Disclosure Declaration).

within the Original SOFA, as modified by the Supplemental Disclosure Declarations, under penalty of perjury.

### H.    The U.S. Trustee Obtains Extensions of the Discharge Objection Deadline

As previously indicated, the Discharge Objection Deadline was fixed at February 18, 2020. Because of the U.S. Trustee's ongoing investigation leading up to the deadline, the U.S. Trustee sought an extension of the deadline to April 20, 2020.  Under the terms of the agreed order entered by the Court, the deadline was extended as requested, but only with respect to the U.S. Trustee (*i.e.*, the extension would not apply to any of Keylor's creditors).[79]  Thereafter, the Court granted the U.S. Trustee another unopposed extension of the Discharge Objection Deadline to July 20, 2020 (again, solely benefiting the U.S. Trustee).[80]

### I.    Keylor Hires New Counsel and Files Additional Supplemental Disclosures

A few days before expiration of the extended Discharge Objection Deadline, Keylor hired new bankruptcy counsel, Mark French ("**French**").[81]  With the assistance of French, Keylor filed even more amendments to his SOFA and Schedules.

#### 1.    The Amended SOFA

First, on July 17, 2020, Keylor filed an amended SOFA (the "**Amended SOFA**")[82] to modify or supplement, as applicable, his responses to the following questions of the SOFA:

---

[79] *See* Bankruptcy Case Docket Nos. 45 and 47.

[80] *See* Bankruptcy Case Docket Nos. 55 and 57.

[81] *See* Bankruptcy Case Docket Nos. 62, 70 and 71.

[82] *See* Exh. UST-13 (Amended SOFA).  While the Amended SOFA is the first amended SOFA document filed by Keylor, it is in reality the fourth amended SOFA after taking into account the Second and Third Supplemental Disclosure Declarations which purported to supplement the Original SOFA.

### (a) Prepetition Income (SOFA Questions 4 and 5)

First, in response to SOFA Question 4, Keylor amended his response to change his 2017 income (previously disclosed as a loss of $25,000 from operating a business) to positive income of $91,090 on account of both operating a business and from wages, commissions, bonuses and/or tips. Thus, based upon Keylor's prior disclosed negative income from business operations, it appears that Keylor had previously failed to disclose in excess of $116,000 in wage, commission, bonus and/or tip income. In response to SOFA Question 5, Keylor for the first time disclosed dividend income of $753 in 2017 and $15,461 in 2019.[83] Thus, as modified, the new disclosures are summarized as follows:

| Period | Gross Income from Wages, Commissions, Bonuses, Tips | Gross Income from Operating a Business | Gross Income from All Other Sources (including dividends) |
|---|---|---|---|
| 1/1/2019 – 10/20/2019 | $0 | $61,626 | $15,461 |
| 1/1/2018 – 12/31/2018 | $0 | $82,168 | $0 |
| 1/1/2017 – 12/31/2017 | $91,090 (on a combined basis) | | $753 |

The amended disclosures fail to account, however, for the full amount of the greater than $139,000 in funds transferred by Buckeye Management (from the Buckeye Fidelity Account) to Keylor (the Keylor Fidelity Account) in 2019.

### (b) Business Ownership and Connections (SOFA Question 27)

Next, in response to SOFA Question 27, Keylor amended his prior disclosures to add his ownership/control of Buckeye Management, Buckeye Investments, and IA Center.[84]

---

[83] *See* Amended SOFA, at p.2 (responses to Questions 4 and 5).

[84] *See* Amended SOFA, at pp.12-13 (response to Question 27).

### (c) Held or Controlled Property of Someone Else (SOFA Question 23)

Third, in response to SOFA Question 23, Keylor amended his prior response to disclose that he was purportedly holding or controlling the Porche for the benefit of Buckeye Management and the Audi and BMW for the benefit of Buckeye Investments.[85]

### 2.    The Fourth Amended Schedules

On the same date, July 17, 2020, Keylor filed amended Schedule A/B (the "**Fourth Amended Schedules**")[86] to modify or supplement, as applicable, his responses to the following questions of the Schedules:

### (a) Vehicle Ownership (Schedule A/B Question 3)

In relation to the disclosure of vehicle ownership interests, Keylor amended his response to Question 3 of Schedule A/B to disclose an interest in a 2009 Cadillac SRX.[87]  Keylor did not disclose having any ownership interest in the Porsche, Audi, or BMW as of the Petition Date.

### (b) Business Ownership (Schedule A/B Questions 19, 37 and 42)

Next, in relation to the disclosure of business ownership interests, Keylor amended his response to Question 19 of Schedule A/B to add his ownership interests in Integrated Alliance, Buckeye Management, and Buckeye Investments.[88]  In each case, Keylor listed the value of such ownership interest as $0 as of the Petition Date.[89]  Additionally, Keylor amended his response to Question 37 of Schedules A/B (inquiring into whether he owned or held any legal or equitable interest in any business-related property) from "no" to "yes", and amended Question 42 of

---

[85] *See* Amended SOFA, at pp.8-9 (response to Question 23).

[86] *See* Exh. UST-12 (Fourth Amended Schedules).

[87] *See* Fourth Amended Schedules, at p.3 (response to Schedule A/B Question 3).

[88] *See* Fourth Amended Schedules, at p.5 (response to Schedule A/B Question 19).

[89] *See id*.

Schedule A/B to add, in relation to his partnership interest in Integrated Alliance, the assets purportedly owned by Integrated Alliance as of the Petition Date.[90]

**J.      The U.S. Trustee Objects to Keylor's Discharge**

On July 20, 2020, the U.S. Trustee filed the Complaint to timely object to the granting of a bankruptcy discharge to Keylor, asserting that Keylor made multiple false statements under oath with respect to his ownership of business interests and the value of such interests, his connection and/or position of control with respect to all business entities owned and/or controlled by him, his prepetition income, and his ownership interest in vehicles. While Keylor acknowledges a failure to timely disclose much of the information targeted by the U.S. Trustee, he asserts that none of the omissions were knowingly made or on account of any fraudulent intent but, rather, due to excusable carelessness on account of his distraught state of mind and reliance upon inexperienced bankruptcy counsel from Taub, his attorney at the time.

## DISCUSSION

The federal bankruptcy system is designed to provide the honest but unfortunate debtor with the opportunity to obtain a fresh financial start.[91] As explained by the Supreme Court, "a central purpose of the [Bankruptcy] Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"[92] A key component of making peace with one's creditors is the debtor's complete, truthful and timely disclosure of financial information with respect to his assets, liabilities, and financial affairs. The failure of a debtor to timely provide such information in a

---

[90] *See* Fourth Amended Schedules, at p.8 (response to Schedule A/B Question 42).

[91] *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007).

[92] *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

chapter 7 case hinders the ability of the chapter 7 trustee to fully and effectively administer the bankruptcy estate for the benefit of creditors.  Accordingly, some have described the discharge in bankruptcy as a privilege reserved for only those debtors who engage in the bankruptcy process in an honest, forthright and timely manner.[93]  For those debtors who fail to do so, the Bankruptcy Code sets out a number of grounds for the denial of a discharge.[94]

Section 727(a)(4)(A) of the Bankruptcy Code is one such provision, denying a discharge to a chapter 7 debtor if "the debtor knowingly and fraudulently, in or in connection with the case … made a false oath or account."[95]  To prevail on an objection to discharge under § 727(a)(4)(A), the plaintiff must prove by preponderance of the evidence that: (1) the debtor made a statement under oath in, or in connection with, the bankruptcy case; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement was material to the bankruptcy case.[96]  While the burden of persuasion always rests with the plaintiff, once the plaintiff has presented sufficient evidence of misconduct to establish a prima facie case for the denial of a discharge under section 727(a)(4)(A), the burden shifts to the debtor to rebut such evidence.[97]

---

[93] *See, e.g., In re Tabibian*, 289 F.2d 793, 795 (2nd Cir. 1961) ("a discharge is a privilege granted the honest debtor and not a right accorded to all bankrupts"); *see also United States v. Johnston*, 267 B.R. 717, 722-23 (N.D. Tex. 2001), *aff'd*, 48 Fed. Appx. 917 (5th Cir. 2002).

[94] *See generally* 11 U.S.C. § 727(a)(2)-(a)(7) (grounds for the denial of a discharge in chapter 7).

[95] 11 U.S.C. § 727(a)(4)(A).

[96] *Judgment Factors, LLC v. Packer (In re Packer)*, 816 F.3d 87, 94 (5th Cir. 2016); *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir.), *cert. denied*, 534 U.S. 1042 (2001).

[97] *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 696 (5th Cir. 2009) (a party "objecting to the debtor's discharge bears the initial burden of production to present evidence that the debtor made false statements. If the plaintiff establishes a prima facie case, the burden shifts to the debtor to present evidence that he is innocent of the charged offense") (internal citation omitted) (citing *First Tex. Savings Ass'n v. Reed (In re Reed)*, 700 F.2d 986, 992 (5th Cir. 1983) ("While the burden of persuasion rests at all times on the creditor objecting to discharge, it is axiomatic that the debtor cannot prevail if he fails to offer credible evidence after the creditor makes a prima facie case")); *see also Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987).

## A.    False Statements Under Oath

The U.S. Trustee points to two categories of alleged false oaths made by Keylor in connection with the Bankruptcy Case: (1) those with respect to the information disclosed in or omitted from the Original Schedules, the Original SOFA, and the amendments thereto; and (2) the testimony provided by Keylor at the 341 Meeting.

### 1.    Statements Under Oath

There is no dispute about the fact that each of the Original Schedules, First Amended Schedules, Second Amended Schedules, Third Amended Schedules, Fourth Amended Schedules, Original SOFA, Amended SOFA, First Supplemental Disclosure Declaration, Second Supplemental Disclosure Declaration, and Third Supplemental Disclosure Declaration was signed by Keylor under penalty of perjury as containing true and correct information.  And because each of the factual statements contained therein was a statement made by Keylor in, and in connection with, the Bankruptcy Case, such statements satisfy the first element of the U.S. Trustee's § 727(a)(4)(A) objection.

Separately, in the case of the testimony provided by Keylor at the 341 Meeting, before providing any testimony, Keylor was placed under oath.  Thereafter, each of the factual statements testified to by Keylor during the course of the 341 Meeting was a statement made by Keylor in connection with the Bankruptcy Case, thereby also satisfying the first element of the U.S. Trustee's § 727(a)(4)(A) objection.

### 2.    Falsity of Statements

In considering the falsity of statements, it is important to understand that the types of statements subject to evaluation under § 727(a)(4)(A) are not only statements of affirmatively disclosed information, but also omitted statements of information where the disclosure of such

information is required.[98]  With that in mind, the following categories of disclosures and omissions

are challenged by the U.S. Trustee:

_Business Interest Ownership and Valuations_.  First, with respect to the required disclosure

of business interest ownership and valuation (Questions 19, 37 and 42 of Schedule A/B):

- Keylor falsely omitted the disclosure of his ownership interests in Integrated Alliance (99%), Blue Sky (100%), GPK Capital (100%), Source One (100%), Buckeye Management (20%), and Buckeye Investments (20%) in his Original Schedules;

- Keylor falsely omitted the disclosure of his ownership interests in Integrated Alliance, Blue Sky, Source One, Buckeye Management, and Buckeye Investments in his First Amended Schedules;

- Keylor falsely omitted the disclosure of his ownership interests in Integrated Alliance, Source One, Buckeye Management, and Buckeye Investments in his Second Amended Schedules;

- Keylor falsely testified to the accuracy of the Second Amended Schedules at the 341 Meeting; and

- Keylor falsely omitted the disclosure of his ownership interests in Integrated Alliance, Buckeye Management, and Buckeye Investments in his Third Amended Schedules.

Only after the originally fixed Discharge Objection Deadline had passed and just days prior to the

extended Discharge Objection Deadline for the U.S. Trustee did Keylor fully disclose all of his

ownership interests in the business entities that he had organized with the assistance of Taub, his

long-standing attorney and bankruptcy counsel.

Moreover, even under the Fourth Amended Schedules, Keylor continued to obfuscate the

true state of his business holdings in Buckeye Management and Buckeye Investments by valuing

such ownership interests as $0.  In the case of Buckeye Management, such valuation failed to take

into account the fact that Buckeye Management had paid off all debt with the sale of the Corpus

Property and was still holding in excess of $400,000 in sales proceeds in the Buckeye Fidelity

---

[98] _See CHP, LLC v. Schwyhart (In re Schwyhart)_, 618 B.R. 793, 810 (Bankr. N.D. Tex. 2020) ("An omission of information requested in a debtor's schedules or statement of financial affairs is an affirmatively false statement that the undisclosed information did not exist") (citing _Gebhart v. Gartner (In re Gartner)_, 326 B.R. 357, 374 (Bankr. S.D. Tex. 2005)).

Account as of October 31, 2019, shortly after the Petition Date. In the case of Buckeye Investments, such valuation failed to take into account Buckeye Investments' ownership of the Carrollton Property and the value of the stream of income being realized from the lease of the property to at least eight commercial tenants as of December 2019, shortly after the Petition Date.

*Business Entity Connections and Control*. Second, with respect to the required disclosure of business entity connections and control (Question 27 of the SOFA):

- Keylor falsely omitted the disclosure of his connection to/control of GPK Capital, Source One, IA Center, Buckeye Management, and Buckeye Investments in his Original SOFA;
- Keylor falsely omitted the disclosure of his connection to/control of Source One, IA Center, Buckeye Management, and Buckeye Investments in the First and Second Supplemental Disclosure Declarations;
- Keylor falsely testified to the accuracy of the Original SOFA as supplemented by the First and Second Supplemental Disclosure Declarations at the 341 Meeting; and
- Keylor falsely omitted the disclosure of his connection to/control of Source One, IA Center, Buckeye Management, and Buckeye Investments in the Third Supplemental Disclosure Declaration.

Only after the originally fixed Discharge Objection Deadline had passed and just days prior to the extended Discharge Objection Deadline for the U.S. Trustee did Keylor fully disclose all of his connections to/control of each of the business entities that he had organized with the assistance of Taub, his long-standing attorney and bankruptcy counsel.

*Income*. Third, with respect to the required disclosure of income (Questions 4 and 5 of the SOFA):

- Keylor falsely omitted the disclosure of 2017 wage/commission/bonus/tip income and 2017 and 2019 dividend income from his Original SOFA;
- Keylor falsely testified to the accuracy of the disclosed income figures in the Original SOFA at the 341 Meeting; and
- Keylor falsely omitted from his Amended SOFA the disclosure of the full extent of the income received from Buckeye Management (whether intended as compensation or as equity distributions) through the disbursement of in excess of $139,000 from the Buckeye Fidelity Account to the Keylor Fidelity Account in 2019.

_Vehicle Ownership_.  Finally, with respect to the required disclosure of ownership interests in vehicles (Question 3 of Schedule A/B):

- Keylor falsely omitted the disclosure of his ownership interests in the Porsche, Audi and BMW in his Original Schedules;

- Keylor falsely omitted the disclosure of his ownership interests in the Porsche, Audi and BMW in his First Amended Schedules;

- Keylor falsely omitted the disclosure of his ownership interests in the Porsche, Audi and BMW in his Second Amended Schedules;

- Keylor falsely testified to the accuracy of the Second Amended Schedules at the 341 Meeting;

- Keylor falsely omitted the disclosure of his ownership interests in the Porsche, Audi and BMW in his Third Amended Schedules; and

- Keylor falsely omitted the disclosure of his ownership interests in the Porsche, Audi and BMW in his Fourth Amended Schedules.

While the evidence was clear that Keylor jointly purchased the Porsche with Buckeye Management and the Audi and BMW with Buckeye Investments, it appears that Keylor attempted to whitewash such interests in his Amended SOFA by claiming that these vehicles were really only held for the benefit of Buckeye Management and Buckeye Investments, respectively.  However, those factual statements are also false inasmuch as Keylor was the primary user of the Audi as of the Petition Date, Mrs. Keylor was the primary user of the BMW as of the Petition Date, and the Keylors had insured all three vehicles under an individual policy in their individual names as of the Petition Date.

Based upon the foregoing, the U.S. Trustee has successfully established the second element of his § 727(a)(4)(A) objection in relation to each of the above referenced false statements and omissions.

**B.    _Knowledge of Falsity_**

Keylor asserts that the business failure of Integrated Alliance caused him to become distraught, depressed, and distracted.  Thus, when advised by his long-time attorney Taub to seek

bankruptcy protection, Keylor complied with such advice and allegedly ultimately relied upon Taub to get everything in order without being sufficiently attentive to the details, himself. Moreover, in the case of his ownership interest in and connections to business entities, Keylor claimed to not be fully knowledgeable of the extent of such ownership and control.  Thus, Keylor claims that he did not *knowingly* provide any false information or *knowingly* fail to provide any required information.

While the business failure of Integrated Alliance and the economic challenges brought about by the same may well serve as an explanation for the resulting mental trauma experienced by Keylor in and around the time of the bankruptcy filing, it does not address the issue of whether Keylor, in fact, had knowledge of information contrary to the disclosures and omissions that he made under oath.  "The complaining party need not prove that the debtor consciously chose to omit or misstate information, only that the debtor knew the truth when the omission or misstatement was made."[99]

Here, the Court finds that Keylor had knowledge of the falsity of the disclosures and omissions described above because he knew the true state of his business ownership and financial affairs.  Contrary to the suggestion that Keylor is nothing more than a poorly-educated, unworldly individual, Keylor is a highly motivated, highly sophisticated businessman who started his own call center company and successfully operated and grew it for over three decades.  Given his hands-on, lengthy experience in managing Integrated Alliance and the entities organized around it to facilitate its business, as well as his control and management of the Buckeye real estate investment

---

[99] *Cadle Co. v. Mitchell (In re Mitchell)*, 102 Fed. Appx. 860, 862 n.1 (5th Cir. 2004); *see also Benchmark Bank v. Crumley (In re Crumley)*, 428 B.R. 349, 366 (Bankr. N.D. Tex. 2010) ("Knowledge of falsity may be demonstrated by circumstantial evidence, and by direct evidence where the debtor[ ] had knowledge of [his] current and former business affairs").

entities, Keylor was clearly aware of his business ownership interests and his personal financial affairs, and his testimony to the contrary was and is simply not credible.

Based upon the foregoing, the U.S. Trustee has successfully established that each of the above-referenced false statements and omissions was knowingly made by Keylor, thereby satisfying the third element of his § 727(a)(4)(A) objection.

## C.    *Fraudulent Intent*

An objecting party may prove fraudulent intent by showing either an actual intent to deceive on the part of the debtor or the debtor's reckless indifference to the truth.[100]  And while it has been recognized that "a discharge cannot be denied when items are omitted from the schedules by honest mistake,"[101] it has also been recognized that "the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent."[102]

With the foregoing in mind, here again Keylor attempts to shift blame to Taub, upon whom Keylor allegedly relied and who purportedly made a series of rookie bankruptcy counsel mistakes, and by claiming that, if anything, Keylor was simply inattentive due to the distraught and depressive state of mind as of the bankruptcy filing.  If Keylor had made but one or two, or even a handful, of mistakes that were promptly corrected, perhaps the Court would find Keylor's explanation credible and find no fraudulent intent.  But given Keylor's persistent pattern of inaccurate and omitted disclosures – which, at best, can be characterized as a reckless disregard

---

[100] *Packer*, 816 F.3d at 95; *Sholdra*, 249 F.3d at 382.

[101] *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992); *see also Neary v. Harding (In re Harding)*, Adversary No. 14-03078, 2015 WL 222482, at *5 (Bankr. N.D. Tex. Jan. 14, 2015).

[102] *Duncan*, 562 F.3d at 695; *see also Crumley*, 428 B.R. at 366-67.

for the truth – the U.S. Trustee has successfully established that such conduct rises to the level of actual deceptiveness.

It is also important to note that while a debtor's reliance on the advice of counsel may, in certain circumstances, excuse a debtor's failure to make accurate disclosures, such reliance must be reasonable and in good faith and a debtor cannot simply blindly rely upon counsel as an excuse for providing false information or for failing to provide required information.[103] "A debtor has a paramount duty to carefully consider all questions posed on his schedules and statement of affairs and see that each question is answered completely in all respects."[104] Indeed, counsel is not the one executing the verification under penalty of perjury that all of the information set out in the Schedules and SOFA is complete and true and accurate – it is the debtor. Thus, "the advice of counsel is no defense when it should have been obvious to the debtor that his attorney was mistaken."[105]

Here, Keylor executed no fewer than ten different documents under penalty of perjury that either contained an incorrect factual disclosure or that omitted required information. Moreover, he testified at the 341 Meeting that he had read each page of the Original Schedules and Original SOFA before signing them.[106] Thus, it is simply inconceivable to believe that such conduct was nothing more than a series of honest mistakes or mere negligence.[107] "A debtor cannot, merely by

---

[103] *See Schwyhart*, 618 B.R. at 812 (citing *Gartner*, 326 B.R. at 374).

[104] *Hughes v. Wells (In re Wells)*, 426 B.R. 579, 599 (Bankr. N.D. Tex. 2006) (quoting *Morton v. Dreyer (In re Dreyer)*, 127 B.R. 587, 593-94 (Bankr. N.D. Tex. 1991)).

[105] *Robinson v. Worley*, 849 F.3d 577, 586 (4th Cir. 2017).

[106] *See Gartner*, 326 B.R. at 374 (courts have found reasonable reliance to be lacking where the debtor has "admitted under oath to having read and signed the Schedules and Statement of Financial Affairs that are challenged") (citing *Dreyer*, 127 B.R. at 597).

[107] *See Schwyhart*, 618 B.R. at 811 ("A debtor's failure to correct inconsistent statements and omissions when he or she files amended schedules, coupled with the existence of more than one falsehood in them, may give rise to a reckless indifference to the truth") (citing *Beaubouef*, 966 F.2d at 178).

playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath."[108]

Accordingly, the U.S. Trustee has satisfied the fourth element of his § 727(a)(4)(A) objection.

### D.    *Materiality*

The subject matter of a false oath is material, and thus sufficient to bar a discharge, if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.[109]  In the case of fraudulently omitted information, the materiality of the omission is not determined on the basis of the value of the omitted asset or whether the omission was detrimental to a creditor;[110] instead, the materiality of the omission is determined on the basis of the importance of the information at issue to the administration of the estate and bankruptcy case.

Thus, here, because all of the false oaths at issue involve assets of the estate or bear a relationship to the estate insofar as involving prepetition business transactions and business dealings of the debtor, and because all of the false oaths involve disclosures mandated by the Bankruptcy Code and Bankruptcy Rules, they are material for purposes of § 727(a)(4)(A). Keylor's ownership interests in the business entities and vehicles, and the amount and sources of his income, all clearly "bear a relationship" to the estate and to administration of the estate.  A debtor's full disclosure of his assets and liabilities in his Schedules and full disclosure of his financial affairs in his SOFA are essential to the bankruptcy process because the Schedules and

---

[108] *Neary v. Peres (In re Peres)*, Adversary No. 05-3768, 2007 WL 2766776, at *7 (Bankr. N.D. Tex. Sept. 18, 2007) (quoting *Tully*, 818 F.2d at 112).

[109] *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005); *Beaubouef*, 966 F.2d at 178.

[110] *Beaubouef*, 966 F.2d at 178.

SOFA "serve the important purpose of ensuring that adequate information is available for the Trustee and creditors without need for investigation to determine whether the information provided is true."

Accordingly, the U.S. Trustee has satisfied the final element of his § 727(a)(4)(A) objection as well.

### *CONCLUSION*

For all of the foregoing reasons, the U.S. Trustee's objection under 11 U.S.C. § 727(a)(4)(A) to the grant of a discharge to Keylor will be sustained and Keylor will be denied such discharge.  The Court will separately enter a final judgment in conformity herewith.

# # # END OF MEMORANDUM OPINION # # #